UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTON REALTY, LLC, | ) | |
| ANDY MOHR TRUCK CENTER, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:13-cv-01915-JMS-TAB |
| vs. | ) | |
| | ) | |
| GUARDIAN BROKERS LTD., INC., | ) | |
| NATIONAL BANK OF COMMERCE, NA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| GUARDIAN BROKERS LTD., INC., | ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ANDY MOHR TRUCK CENTER, INC., | ) | |
| ANTON REALTY, LLC, | ) | |
| | ) | |
| Counter Defendants. | ) | |

## ORDER

Plaintiff Anton Realty, LLC and Andy Mohr Truck Center, Inc. (collectively, "Anton Realty") bring this suit against Defendants Guardian Brokers Ltd., Inc. ("Guardian Brokers") and National Bank of Commerce, NA, asserting several claims under Indiana law.  Guardian Brokers asserts state-law counter claims against Anton Realty.  The parties' claims all revolve around a dispute regarding the ownership of real property located at 1301 South Holt Road, Indianapolis, IN (the "Property") and Guardian Brokers' entrance onto the Property following the ownership dispute.

Presently pending before the Court are Guardian Brokers' and Anton Realty's cross motions for summary judgment.  For the reasons explained, Guardian Brokers' Motion for Summary Judgment is **GRANTED**, [Filing No. 106], and Anton Realty's Cross Motion for Summary Judgment is **DENIED**, [Filing No. 133].  Because the parties' briefs adequately framed the issues, oral argument was unnecessary to resolve these motions, Anton Realty's Motion for Oral Argument is therefore **DENIED**.  [Filing No. 141.]

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In

other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, *Fed. R. Civ. P. 56(c)(3)*, and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-

- 3 -

movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## II.
### BACKGROUND

The following factual background is drawn from the undisputed evidence submitted by the parties unless otherwise noted.

### A.    The Property Dispute

This action revolves around the disputed ownership of the Property.  M-3 Investments, LLC ("M-3")—whose only member is Mark Smith—purchased the Property through a loan from Fifth Third Bank ("Fifth Third"), signed a note to Fifth Third to repay the loan, and granted Fifth Third a mortgage on the Property (collectively, the Court will refer to the note and mortgage on the Property as the "Notes").  [Filing No. 57-2 at 1; Filing No. 135-37 at 2.]

In March 2010, Andy Mohr Automotive Group, Inc. ("Andy Mohr Automotive Group") leased the Property from M-3.  [Filing No. 135-40 at 1.]  Andy Mohr Automotive Group subsequently assigned the lease to Plaintiff Andy Mohr Truck Center (the "Truck Center"), which operates a Volvo semi-truck dealership on the property.  [Filing No. 135-40 at 1.]

In May 2010, M-3 entered into a settlement agreement (the "Settlement Agreement") with Fifth Third regarding the loan and mortgage on the Property.  [Filing No. 57-2 at 1; Filing No. 57-2 at 6-9.]  The Settlement Agreement provided debt forgiveness for M-3 in excess of $3.2 million, required M-3 to "execute and deliver a deed in lieu of foreclosure if requested by [Fifth Third]," and assigned all lease payments from the Property to Fifth Third.  [Filing No. 57-2 at 6-7.]

Guardian Brokers is a property management company based in Alabama owned in part by Keith Sharp.[1]  [Filing No. 135-36 at 2.]  On July 15, 2013, Guardian Brokers entered into a Loan Purchase and Assumption Agreement (the "Loan Purchase Agreement") with Fifth Third.  [Filing No. 57-1 at 2; Filing No. 135-7.]  Pursuant to the Loan Purchase Agreement, Guardian Brokers agreed to pay Fifth Third $700,000 in exchange for Fifth Third's rights in the Notes with M-3 regarding the Property.  [Filing No. 135-7.]  Guardian Brokers, as part of the Loan Purchase Agreement, agreed to "fully and timely pay, perform, and discharge when due, all of the liabilities of [Fifth Third] arising in respect of the Loan."  [Filing No. 135-7 at 3.]

Anton Realty is a limited liability based in Indiana, and its sole member is Andy Mohr.  [Filing No. 24 at 1.]  In late August and early September of 2013, Andy Mohr, who knew of Guardian Brokers' intent to purchase the Notes from Fifth Third, explored purchasing the Property from M-3.  [Filing No. 57-4 at 11-12.]  Mr. Mohr had informed Mr. Smith that he was buying the Property but Guardian Brokers had also stated that it bought the property, so, on September 5, 2013, Mr. Smith emailed Mark Beeghley of Fifth Third requesting an update on the legal status of the Property.  [Filing No. 135-11 at 1-2.]  Mr. Beeghley responded that he was not aware of Mr. Mohr buying the property, and that Fifth Third's purchase contract was with Guardian Brokers.  [Filing No. 135-11 at 1.]  On September 6, 2013, Mr. Beeghley emailed Mr. Smith again, stating as follows:

> In thinking about this a little longer, Andy Mohr could buy the property from you. As long as the funds were sufficient to pay us off that would trump our contract. The reason it would trump our [Loan Purchase Agreement with Guardian Brokers] is that [it] is a note sale.  We are selling our note.  If he purchases the real estate from you, our note ceases to exist.  Therefore, no note sale can happen.  Now the

---

[1] Because Plaintiffs are all citizens of Indiana, Defendants are all citizens of Alabama, and the amount in controversy is met, this Court has diversity jurisdiction over this matter.  [*See* Filing No. 125; Filing No. 129.]

problem is timing.  Our note sale [with Guardian Brokers] is due to close next Friday, [September] 13th.

[Filing No. 135-11 at 1.]

On September 8, 2013, Mr. Mohr contacted Mr. Smith and asked him for the payoff amount because he intended to pay off the mortgage and buy the Property.  [Filing No. 135-37 at 7.]  That same day, Mr. Mohr sent a purchase agreement (the "Purchase Agreement") and other closing documents to Mr. Smith.  [Filing No. 135-13.]  Mr. Smith emailed the documents to his attorney on September 9, 2013, with the following message:

> Check this out.  I still own the [Property].  The dealership property.  As part of my settlement with [Fifth Third] I agreed to hold onto it and sell it.  Andy Mohr is the tenant.  [Fifth Third] has an [agreement] to sell the note to [Guardian Brokers].  Andy is concerned he will get tossed or at a minimum pay significantly higher rent.  So, he wants to sort [of] back door [Guardian Brokers] and pay off the not[e].  [Fifth Third] bank is OK with this because it gets them more than the note was being sold under the [agreement].  I want no risk whatsoever.  I do not have to do this.  Please make changes to [the documents] so I am free and clear no matter what happens.

[Filing No. 135-13 at 1.]  Mr. Smith's attorney responded that the documents are "okay," but that Mr. Smith should seek a representation and warranty from Fifth Third that it "owns the note and mortgage and has not entered into agreement to sell or transfer the note and mortgage to any third party."  [Filing No. 135-13 at 1.]

Fifth Third sent Mr. Smith the payoff letter (the "Payoff Letter") on September 9, 2013.  [Filing No. 135-28; Filing No. 135-29.]  The Payoff Letter, in relevant part, stated as follows:  "Fifth Third Bank will issue appropriate release of mortgage as it relates to the [Property] upon receipt of . . . $765,443.99. . . .  This payoff letter is valid until September 12, 2013."  [Filing No. 135-29 at 2.]  Mr. Sharp became aware of the Payoff Letter the date it was issued.  [Filing No. 135-36 at 4.]  Although Mr. Sharp originally planned on concluding his transaction with Fifth Third pursuant to the Loan Purchase Agreement on September 16, 2013, once he became aware

of the Payoff Letter, he thought Fifth Third was trying to circumvent the Loan Purchase Agreement and thus sought to conclude the transaction earlier.  [Filing No. 135-36 at 4-5.]

On September 10, 2013, Guardian Brokers wired the balance owed under the Loan Purchase Agreement to Fifth Third.  [Filing No. 57-1 at 2.]  After wiring the money to Fifth Third, Mr. Sharp emailed Mr. Smith, stating that Guardian Brokers is "the new owner of the note" and that he is ready for Mr. Smith "to sign the deed for a total release of the note."  [Filing No. 57-1 at 47.]  Mr. Smith forwarded the email to Mr. Beeghley, asking "[w]hat in the heck is going on here?" [Filing No. 135-16 at 1.]  However, Mr. Smith did not receive a response.  [Filing No. 57-2 at 3.]

At 6:25 a.m. on September 11, 2013, Mr. Smith sent a longer email to Mr. Beeghley, stating as follows:

> It appears that Mr. Sharp has no idea what is going on here.  He appears to believe that he already owns the note.  How can we close on the property at noon today and payoff a note that he already owns?
>
> If he doesn't own the note, shouldn't [Fifth Third] just tell him that you are breaking the deal by having me payoff the note with funds from Mohr?
>
> The last thing I want is Mr. Sharp thinking I broke the deal.  I am only sticking to my agreement with [Fifth Third] which is [to] sell the property in the best interest of [Fifth Third].  If paying off the note at noon today is going to cause me problems, I would just as soon not do it.
>
> So, . . . I would like [Fifth Third to] tell me exactly which direction to proceed.  1. Sign the deed for Mr. Sharp[;] 2. Payoff the loan with funds from Mr. Mohr.

[Filing No. 57-2 at 28.]

Mr. Smith also forwarded Mr. Sharp's email to Mr. Mohr at 7:15 a.m. on September 11, 2013, stating:  "I don't think the bank has told this guy anything.  See why I am concerned."  [Filing No. 57-2 at 31-32.]  Mr. Mohr responded at 8:42 a.m.:  "No worries.  There will be no loan to buy. No recourse for anything.  He might be disappointed but [there is] nothing he can do if the loan is paid."  [Filing No. 57-2 at 31.]  Later that morning, a representative from Anton Realty went to

Mr. Smith's office, and Mr. Smith signed a series of documents (the "Conveyance Documents"), including a Contract for Purchase of Real Estate, in order to close the transaction with Anton Realty.  [Filing No. 135-37 at 13.]

Mr. Smith returned to his desk to find an email from Mr. Beeghley, which stated as follows: "Please find attached a notification letter that the loan has been sold to [Guardian Brokers]."  [Filing No. 135-24 at 1.]  The notification letter stated that M-3's "commercial note with Fifth Third Bank has been sold to [Guardian Brokers]," and that "[t]he terms of [the] original note . . . will remain the same."  [Filing No. 135-24 at 2.] Mr. Smith forwarded this email to Mr. Mohr that morning, saying only, "Unbelievable," and Mr. Mohr forwarded the email to his real estate attorney, Joseph Scimia.  [Filing No. 57-4 at 33.]

The closing was scheduled for 12:30 p.m. that same day, September 11, 2013, and was attended by Mr. Mohr, his attorney Mr. Scimia, and William Olsen, the closing agent from Hamilton National Title, who held the deed to the Property from M-3 in trust (the "Escrow Deed"). [Filing No. 135-35 at 6-7.]  During the closing, either Mr. Scimia or Mr. Mohr informed Mr. Olsen that Fifth Third may have assigned its loan.  [Filing No. 57-5 at 6-7.]  In light of this disclosure, Mr. Olsen adjourned the closing so that he could call the officer from Fifth Third who provided the Payoff Letter to Mr. Smith.  [Filing No. 57-5 at 6.]  Mr. Olsen explained his reason for doing so:  "At this point in time I needed . . . to get my directions and confirmations from Fifth Third and/or an assignee of the loan . . . [b]ecause they are the only ones that can accept the payoff and provide me with a release of the mortgage.  A seller has no ability to release the mortgage, at least not legally."  [Filing No. 57-5 at 7; *see* Filing No. 57-5 at 10 (Mr. Olsen explaining that "since the payoff letter [he] had no longer apparently accurately reflected the owner of the loan, [he] would

need to . . . get a confirmation from the new owner that the payoff amount was, in fact, a full satisfaction . . . before proceeding").]

Mr. Olsen called Mr. Beeghley, who said that it was inappropriate for Mr. Olsen to wire funds to Fifth Third because it had received the purchase price and thus "felt duty-bound to consider this loan sold." [Filing No. 57-5 at 10.] Mr. Beeghley then immediately forwarded an email with the letter notifying Mr. Smith that the loan had been sold to Guardian Brokers. [Filing No. 57-5 at 17.] Mr. Olsen then called Mr. Sharp with the intention of acquiring wiring instructions from him to continue the closing, but Mr. Sharp would not accept the payoff amount either. [Filing No. 57-5 at 10-11.] Mr. Sharp told Mr. Olsen that, from his perspective, Guardian Brokers' demand for a deed in lieu of foreclosure from M-3 revoked any purported offer from the September 9 Payoff Letter.[2] [Filing No. 57-1 at 3.] Following that phone call, Mr. Olsen informed Mr. Scimia and Mr. Mohr that he could not "proceed with the closing . . . because [he] had no avenue to . . . pay the loan off, and be entitled to a release" from the mortgage. [Filing No. 57-5 at 11.] Thus, Mr. Olsen did not receive a release of the mortgage, and Hamilton National Title remained in possession of the Escrow Deed provided by M-3. [Filing No. 57-5 at 11; Filing No. 57-5 at 14.]

On September 13, 2013, Fifth Third executed an assignment of the Notes to Guardian Brokers with an effective date of September 10, 2013. [Filing No. 57-1 at 3; Filing No. 57-1 at 38-45.] The assignment of the Notes to Guardian Brokers included, among other things, Fifth Third's rights and obligations under the Settlement Agreement. [Filing No. 57-1 at 44.]

On September 17, 2013, M-3 endorsed and delivered the Notes to Guardian Brokers. [Filing No. 135-36 at 7-8.] Two days later, on September 19, M-3 and Guardian entered into a Mutual

---

[2] Mr. Smith, when signing the Conveyance Documents on September 9, did not understand Mr. Sharp's demand for a deed in lieu of foreclosure to be a revocation of the Payoff Letter. [Filing No. 135-37 at 21.]

Release and Settlement Agreement whereby M-3 agreed to execute and deliver a Deed in Lieu of Foreclosure (the "Deed") to Guardian Brokers in exchange for Guardian Brokers' release of M-3 and Mr. Smith from any liability.  [Filing No. 135-37 at 19-20.]  The next day, on September 20, M-3 executed the Deed to Guardian Brokers.  [Filing No. 57-1 at 49-51.]  The Deed states that it "is an absolute conveyance of [M-3's] right, title and interest in and to said real estate."  [Filing No. 57-1 at 49.]  When Mr. Smith signed the Deed, he did not believe he was conveying anything because he thought M-3 already conveyed its interest in the Property when he signed the Conveyance Documents.  [Filing No. 135-37 at 20.]  Specifically, Mr. Smith told Mr. Sharp before signing the Deed that the property had been sold, since Mr. Smith assumed that Mr. Mohr had completed the closing after Mr. Smith signed the conveyance documents (which he later learned was not true).  [Filing No. 135-37 at 17.]

### B.    Events Following the Property Transactions

Guardian Brokers sent Andy Mohr Automotive Group an invoice for the October 2013 rent payment for the Property on September 30, 2013.  [Filing No. 57-1 at 4; Filing No. 57-1 at 53-54.] On November 1, 2013, Guardian Brokers sent Andy Mohr Automotive Group a Notice of Default, which stated that the October 2013 rent payment was late and that it had ten days to pay the balance due or it would be in default of the lease.  [Filing No. 57-1 at 56-57.]  Through at least August 13, 2014, Andy Mohr Automotive Group had not paid Guardian Brokers any rent.  [Filing No. 57-1 at 4.]

On November 26, 2013, Guardian Brokers' counsel, Rob Thomas, two other representatives of Guardian Brokers, and a security guard went to the Property in an attempt to get the Truck Center and its employees to leave the premises due to non-payment of rent.  [Filing No. 57-3 at 1.]  Mr. Thomas asked to speak to the manager, Andy Jeanor, and told him that the Truck Center

- 10 -

employees needed to leave the Property because Guardian Brokers was evicting the Truck Center, and that the Property would be locked up. [Filing No. 135-42 at 1.] Eventually, Mr. Jeanor called the police, who arrived on the scene and told the Guardian Brokers representatives that they could not evict the Truck Center from the Property this way. [Filing No. 135-42 at 2.] Because Mr. Thomas did not have eviction papers with him, the police told him to leave the Property. [Filing No. 135-42 at 2.]

The Guardian Brokers representatives' visit to the Property was "very disruptive and alarming" to the Truck Center employees. [Filing No. 135-42 at 2.] Their presence "interrupted employees' work and effectively shut down business in the shop." [Filing No. 135-42 at 2.]

### III.
#### DISCUSSION

Anton Realty asserts the following claims against Guardian Brokers in their Third Amended Complaint: (1) quiet title; (2) specific performance; (3) violations of Ind. Code § 32-28-1-2; (4) declaratory judgment; (5) trespass; (6) tortious interference with prospective advantage; and (7) slander of title. [Filing No. 87.] Guardian Brokers asserts the following counterclaims: (1) quiet title; and (2) breach of lease. [Filing No. 104.] The parties both seek summary judgment on all of their claims.

Guardian Brokers first argues that Anton Realty lacks prudential standing to bring any claims regarding the ownership of the Property because Anton Realty's claims are truly against M-3 (for not passing clear title at the scheduled closing) or Fifth Third (for not accepting the payoff amount at the scheduled closing). [Filing No. 107 at 16-17.] But Anton Realty frames its claim as against Guardian Brokers rather than against M-3 or Fifth Third (against which other litigation is pending). Given this, the Court finds it prudent to resolve Anton Realty's claims on the merits as framed, rather than discussing prudential standing.

The doctrine of prudential standing bars courts from hearing certain categories of cases even when the requirements of Article III standing are met.  *See Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013); *MainStreet Organization of Relators v. Calumet City, Ill.*, 505 F.3d 742, 745 (7th Cir. 2007).  As initial matter, the Court may bypass any prudential standing concerns because "prudential standing is not jurisdictional in the sense that Article III standing is," and thus need not be addressed in every case.  *Nocula v. UGS Corp.*, 520 F.3d 719, 726 (7th Cir. 2008); *cf. RK Co. v. See*, 622 F.3d 846, 851-52 (7th Cir. 2010) (holding that prudential standing "issues are subject to waiver" and that the defendant "waived any prudential standing concerns" in the case so they need not be addressed).  Furthermore, one limit prudential standing creates on this Court's ability to hear a case is "that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013) (citation and quotation marks omitted).  But, as explained below, the most obvious flaw with Anton Realty's claims is that it sues the wrong defendant.  Thus, in the Court's view, the most glaring difficulty with Anton Realty's claims is not that it is asserting another party's "legal rights and interests," *id.*, but that it has no claims against Guardian Brokers— in other words, the problem is that it is suing the wrong defendant, not that it is the wrong plaintiff (which is the focus of the prudential standing question).  For these reasons, the Court will not address prudential standing and will instead proceed directly to the merits of Anton Realty's claims.

The Court wishes to emphasize that nothing in the foregoing analysis, nor anything else in this decision, should be construed as an opinion as to whether Anton Realty has meritorious claims

against M-3 or Fifth Third, who are not defendants in this action.  The Court holds only that Anton Realty's claims against Guardian Brokers must fail.

### A.    The Legal Status of the Notes on September 11, 2013

To determine the parties' legal rights with respect to the Property, the Court must begin with the legal effect of the parties' conduct on September 11, 2013.  Guardian Brokers maintains that Anton Realty did not become the owner—and still is not the owner—of the Property because it did not complete the closing on September 11, 2013.  [Filing No. 107 at 24.]  In support of this position, Guardian Brokers argues that its request for a deed in lieu of foreclosure on September 10, 2013, operated to revoke the Payoff Letter, and that M-3 only conveyed the Escrow Deed in trust to Anton Realty, which was never delivered because Anton Realty failed to pay off the mortgage as required for Hamilton National Trust to release the Escrow Deed.  [Filing No. 107 at 24-25.]

Anton Realty responds that the Notes are negotiable instruments and therefore Guardian Brokers had no rights with respect to them until they were actually endorsed and delivered, which had not happened as of September 11, 2013.  [Filing No. 134 at 13-22.]  Without rights in the mortgage, says Anton Realty, Guardian Brokers' request for a deed in lieu of foreclosure had no effect.  [Filing No. 134 at 21-22.]

Guardian Brokers does not contest Anton Realty's argument that the Notes are governed by negotiable instruments law and therefore that it did not have a right to take action with respect to those instruments on September 11, 2013.  [Filing No. 139 at 13.]  Accepting that argument, says Guardian Brokers, is to accept that it was only Fifth Third who could have had any obligation to accept the payoff amount, and thus any argument that Guardian Brokers was required to accept

the payoff amount must necessarily fail. [Filing No. 139 at 13.] Further, Guardian Brokers contends that, accepting Anton Realty's argument, Guardian Brokers had rights under the instruments on September 17, 2013, when the Notes were endorsed and delivered to Guardian Brokers. [Filing No. 139 at 13.]

Anton Realty emphasizes in reply that Guardian Brokers "did not own the Notes on September 11, 201[3] and, therefore, had no right to interfere with the mortgagee's acceptance of the payoff amount tendered by Anton Realty and M-3." [Filing No. 140 at 7.] Yet, on the same page of its reply brief, Anton Realty also asserts that Guardian Brokers "improperly rejected the payoff amount without any legal right to do so." [Filing No. 140 at 7.]

Recognizing that Anton Realty's position regarding the Notes entitles it to summary judgment, Guardian Brokers changes course and accepts Anton Realty's position that the Notes are negotiable instruments, rather than contracts, under Indiana law. *See, e.g.*, *First Valley Bank v. First Sav. & Loan Ass'n of Cent. Ind.*, 412 N.E.2d 1237, 1241 (Ind. Ct. App. 1980) ("[A] promissory note secured by a mortgage is a negotiable instrument."). As such, the instruments must be endorsed and delivered to properly negotiate them. *See* Ind. Code § 26-1-3.1-201 ("[I]f an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its endorsement by the holder."). The parties do not dispute that Fifth Third did not endorse and deliver the Notes until September 17, 2013, at the earliest. [Filing No. 134 at 15; Filing No. 135-36 at 7-8.] Therefore, Fifth Third still retained rights under the Notes on September 11, 2013. Among other things, this means that Guardian Brokers' request for a deed in lieu of foreclosure had no effect; since it was not the holder of the Notes on September 11, it had no rights under the Settlement Agreement to exercise the option contained therein to request a deed in lieu of foreclosure.

Given that Fifth Third owned the Notes on September 11, 2013, Anton Realty's argument that Guardian Brokers "improperly rejected the payoff amount without any legal right to do so," [Filing No. 140 at 7], is a non-starter.  The argument is, however, indicative of Anton Realty's continually shifting position in this case.  It argues at length that Guardian Brokers had no rights under the Notes on September 11, 2013, but in the same breath asserts that Guardian Brokers improperly rejected the payoff amount.  [Filing No. 140 at 7.]  But if Guardian Brokers had no rights under the Notes on September 11, 2013, it had no contractual relationship with Anton Realty whatsoever.[3]  Fifth Third owned the Notes on September 11, 2013, and thus it alone was the party who could accept the payoff of the mortgage in the amount reflect in the Payoff Letter.[4]  However, Fifth Third refused to accept the payoff amount that Anton Realty attempted to pay through M-3.  Whether this was wrongful or not is not at issue in this litigation and nothing in this opinion should be construed as a pronouncement on the matter.  Anton Realty is pursuing a claim for breach of the Payoff Letter against Fifth Third in other litigation.  *See Anton Realty, LLC v. Fifth Third Bank*,

---

[3] For the same reasons, the Court need not delve into Guardian Brokers' initial position that its demand for a deed in lieu of foreclosure operated as a revocation of the offer in the Payoff Letter. [Filing No. 107 at 24-25.]  After Anton Realty argued in its response brief that the Notes were negotiable instruments and, because they had not been delivered on September 11, 2013, Guardian Brokers had no rights in them on that date, Guardian Brokers no longer pressed its position that its demand for a deed in lieu of foreclosure operated as a revocation of the Payoff Letter.  The Court recognizes that individuals involved in the negotiations on September 11, 2013, acted as if the Notes had already been sold—a fact reflected in Guardian Brokers' initial argument that it owned the Notes on that date and revoked the Payoff Letter.  But the individuals' views and conduct on that date do not impact the legal analysis that, because the Notes had not been properly negotiated at that time through endorsement and delivery, Fifth Third remained the owner of the Notes on that date.

[4] Guardian Brokers argues that, even if it owned the Notes on September 11, 2013, and therefore stepped into Fifth Third's shoes, the Payoff Letter is a quote of the payoff amount, not an enforceable contract.  [Filing No. 139 at 14.]  Notably, Anton Realty does not reply and argue that the Payoff Letter is a binding contract.  [*See* Filing No. 140 at 9 n.3.]  In the end, the Court need not decide this question because, even if the Payoff Letter were a binding contract, Guardian Brokers was not party to it on September 11, 2013.

No. 1:15-cv-00199-RLY-TAB (S.D. Ind.).  For the purposes of this suit, however, it is clear that Guardian Brokers did not own the Notes on September 11, 2013, and therefore had not assumed Fifth Third's obligations under the Payoff Letter at that time.[5]  Thus, Guardian Brokers had no obligation to accept the payoff amount on September 11.[6]

Accordingly, Anton Realty's claim predicated on an allegedly wrongful refusal to accept the payoff amount cannot be brought against Guardian Brokers, and Guardian Brokers is entitled to summary judgment on that claim.  Specifically, Guardian Brokers is entitled to summary judgment on Anton Realty's specific performance claim, which asks the Court to order Guardian Brokers to convey the Property to Anton Realty and release the Notes since Guardian Brokers "improperly refused to perform its obligations under the Payoff [Letter]." [Filing No. 87 at 7-8.]

### B.    Ownership of the Property

Having set out the legal status of the parties in relation to the Notes, the Court turns next to how this impacts the parties' dispute regarding ownership of the Property.  The parties both assert quiet title claims, arguing that they are the legal owners of the Property.  Guardian Brokers argues that it has established its quiet title claim by proving that it received and recorded the Deed to the Property on September 20, 2013, which establishes a *prima facie* case for quiet title.  [Filing

---

[5] For these same reasons, Anton Realty's argument that promissory estoppel required Guardian Brokers, as "Fifth Third's purported assignee," to accept the payoff amount is unavailing.  [Filing No. 134 at 27.]  The Payoff Letter was sent by Fifth Third to M-3, and set forth the amount needed to pay off the mortgage in full.  Thus, it in no way could reflect a promise by Guardian Brokers to do anything.  Moreover, the Court already concluded that Guardian Brokers did not have rights to the Notes on September 11, 2013, so it had no obligations with respect to the Payoff Letter when Anton Realty asked it to accept the payoff amount on that date.

[6] To the extent Anton Realty maintains that (1) the Payoff Letter was a binding contract and (2) when Guardian Brokers subsequently obtained the notes on September 17, 2013, it stepped into Fifth Third's shoes in the Payoff Letter and was therefore required to accept the payoff amount on that date, the Court notes that this argument is unavailing because the Payoff Letter was valid only through September 12, 2013.  [Filing No. 135-29 at 2.]  Moreover, Anton Realty fails to explain or present evidence demonstrating how it was a party to the alleged Payoff Letter to M-3.

No. 107 at 20-21.]  Anton Realty cannot overcome the *prima facie* showing, says Guardian Brokers, because Anton Realty did not close on the Property on September 11, 2013, and it never received the Escrow Deed from the title company because the payoff of M-3's loan never occurred. [Filing No. 107 at 20-21.]

Anton Realty responds that Guardian Brokers' possession of the Deed is not *prima facie* evidence of good title because to so hold would be inequitable given Guardian Brokers' "improper rejection of the tendered payoff on September 11, 2013—the only act that prevented Anton Realty from closing its purchase of the Property from M-3." [Filing No. 134 at 29.]  Instead, Anton Realty argues that Guardian Brokers' unjust conduct should equitably estop it from claiming title to the property. [Filing No. 134 at 30.]  Anton Realty further contends that even if Guardian Brokers has established a *prima facie* case of title to the Property, Anton Realty has "established the defects in Guardian[] [Brokers'] alleged title and its paramount claim to the same." [Filing No. 134 at 30.] Specifically, Anton Realty maintains that it acquired "equitable title" to the Property from M-3 when it entered into the Purchase Agreement on September 8, 2013—which is several days before September Guardian Brokers recorded the Deed to the Property on September 20, 2013. [Filing No. 134 at 12.]

Guardian Brokers replies that the doctrine of equitable title under Indiana law has never been invoked to give a party claiming equitable title, as Anton Realty does here, legal title to property. [Filing No. 139 at 6-9.]  Further, Indiana's law of conveyances makes clear that legal title to a property does not pass until the deed is delivered, and the undisputed facts here "establish that M-3 made and executed [the Escrow Deed] in favor of Anton [Realty], but because the conditions of their purchase agreement were not met—title insurance could not be provided—the [Escrow Deed] was never actually *delivered*." [Filing No. 139 at 9.]

- 17 -

Anton Realty replies that Guardian Brokers' position with regard to the ultimate deliverance of the Deed by M-3 ignores that "Anton Realty's purchase did not close because of Guardian[] [Brokers'] interference" and that "Guardian [Brokers] had no legal right to interfere with the closing." [Filing No. 140 at 2.]  Because Guardian Brokers' action caused the failure of the condition precedent for closing, says Anton Realty, it cannot rely on that failure to assert legal title to the Property.  [Filing No. 140 at 7-8.]

"In a suit to quiet title, the plaintiff is bound to prove that he was the owner of the land in controversy at the commencement of the action."  *Ritz v. Ind. & Ohio R.R., Inc.*, 632 N.E.2d 769, 772 (Ind. Ct. App. 1994).  "Record title is the highest evidence of ownership and is not easily defeated."  *Id.*  "For a valid transfer of legal title, the grantor must make, execute, and deliver a deed to the grantee containing words of conveyance and describing the property and the interest to be conveyed."  *Patterson v. Seavoy*, 822 N.E.2d 206, 210 (Ind. Ct. App. 2005).

It is undisputed that Anton Realty never received the Escrow Deed placed in trust by M-3 during its attempt to acquire ownership of the Property on September 11, 2013.  Because Mr. Olsen from Hamilton National Title never received the mortgage payoff amount from Fifth Third (or Guardian Brokers), and thus never received a release of the mortgage, the Escrow Deed remains in trust with M-3.  [Filing No. 57-5 at 6-7; Filing No. 57-5 at 11; Filing No. 57-5 at 14.]  Accordingly, since the Escrow Deed was never delivered to Anton Realty, legal title did not transfer to

Anton Realty on September 11, 2013 (or on any other date, given that M-3 continues to hold the Escrow Deed in trust).[7]  *See* Patterson, 822 N.E.2d at 210.

Unlike Anton Realty's attempt to acquire legal title to the Property, the undisputed evidence shows that Guardian Brokers obtained from M-3, and subsequently recorded, the Deed to the Property on September 20, 2013.  [Filing No. 57-1 at 3; Filing No. 135-25.]  Therefore, on September 20, 2013, a valid transfer of legal title of the Property from M-3 to Guardian Brokers—via the executed and delivered Deed—occurred.  *See* Patterson, 822 N.E.2d at 210.

Anton Realty resists this conclusion on several grounds, all of which are based in equity, and none of which are availing.  First, Anton Realty argues that equity should not permit Guardian Brokers to have legal title to the Property because it "wrongfully prevented" Anton Realty from completing the closing on September 11, 2013.  [Filing No. 134 at 29.]  But as the Court held above, Guardian Brokers had no rights under the Notes on September 11, 2013.  Given this, the Court cannot conclude that Guardian Brokers' rejection of the payoff amount was in any way wrongful—it was not party to the Purchase Agreement or Payoff Letter that were at issue during Anton Realty's attempt to close on the Property on September 11, 2013.

Next, Anton Realty contends that Guardian Brokers had unclean hands, which is an equitable doctrine standing for the proposition that "one who seeks equitable relief [must] be free of

---

[7] Anton Realty argues that, because the Escrow Deed was placed in trust on September 11, 2013, "when the conditions pass that result in the deed being released from escrow, the transfer of the deed relates back to the date placed in escrow . . . , which is well before Guardian[] [Brokers'] receipt of a deed on September 20."  [Filing No. 140 at 9 (citing *Freeland v. Charnley*, 80 Ind. 131, 137 (Ind. 1881)); *see* Filing No. 134 at 30.]  Anton Realty, however, does not go on to explain how and why the relation-back principle matters in this case.  Nevertheless, the authority on which Anton Realty relies makes clear that "[w]here a deed is delivered as an escrow, it does not become operative until rightfully delivered to the grantee," and until delivery, the deed lacks any "efficacy."  *Freeland*, 80 Ind. at 137.  Anton Realty presents no evidence—nor even alleges—that the Escrow Deed has ever been delivered.  Accordingly, Anton Realty's invocation of the relation-back doctrine fails to advance its position.

wrongdoing in the matter before the court." *Ruder v. Ohio Valley Wholesale, Inc.*, 736 N.E.2d 776, 780 (Ind. Ct. App. 2000). This doctrine is inapplicable here both because Guardian Brokers is not seeking equitable relief and, perhaps more importantly, because Anton Realty has not produced any evidence that Guardian Brokers engaged in wrongdoing.

Anton Realty also raises equitable estoppel, which in this context provides that the Court may "take the title to land from one person and vest it in another where justice requires that such action be done." *Hutter v. Weiss*, 177 N.E.2d 339, 344 (Ind. Ct. App. 1961). The Court finds it odd that Anton Realty invokes equity given its conduct in this case. As the Court details below, Anton Realty discontinued paying rent on the Property despite the fact that its efforts to purchase the Property on September 11, 2013 failed. Moreover, it was Anton Realty that attempted to disrupt Guardian Brokers' acquisition of the Notes from Fifth Third via the Loan Purchase Agreement by buying the Property before the Loan Purchase Agreement closed. [*See, e.g.*, Filing No. 57-2 at 31; Filing No. 57-4 at 11-12; Filing No. 135-11 at 1-2.] The Court is not suggesting that this conduct was illegal or anything beyond a calculated business decision; but after Anton Realty's play to disrupt Guardian Brokers' acquisition of the Property failed, the Court certainly will not be convinced that Guardian Brokers' legal steps to ensure that it acquired the Property were in any way inequitable such that justice requires Anton Realty to be given the Property.

At bottom, this case is about a race to the closing table. Anton Realty thought it would win that race by quickly purchasing the Property before Guardian Brokers' agreement with Fifth Third to buy the Notes closed. Anton Realty's move failed and Guardian Brokers purchased the Notes and obtained the Deed to the Property. Equity does not provide recourse when an attempt to trump a competitor's business deal fails due to no wrongful conduct on the competitor's part. This is especially true when, as here, Anton Realty was the party who first attempted to thwart Guardian

Brokers' deal, and then when that failed, stopped paying rent it owed on the Property.  For these reasons, the Court cannot conclude that Anton Realty is deserving of any equitable relief.

Finally, Anton Realty asserts that it held equitable title to the Property when it signed the Purchase Agreement with M-3, which occurred several days before Guardian Brokers obtained and recorded the deed from M-3.  But Anton Realty primarily relies on equitable title to support its position that it has standing to bring its claims; it does not otherwise explain how its equitable title could ever transform into legal title to the Property.  [*See* Filing No. 134 at 11-13.]  Guardian Brokers highlights this, and notes that there no legal authority in Indiana supporting the idea that equitable title can convert into legal title.  [Filing No. 139 at 6-9.]  Notably, Anton Realty does not reply with any legal authority to the contrary.

Anton Realty's reliance on the doctrine of equitable title fails to advance its position.  Anton Realty failed to cite a single Indiana authority supporting its position that equitable title can ever turn into legal title without the execution and delivery of the deed.  The only authorities on which it originally relied do not prove otherwise and are wholly unrelated to the circumstances of this case.  For example, in *Area Plan Comm'n of Evansville-Vanderburgh Cnty. v. Hatfield*, 820 N.E.2d 696, 699 (Ind. Ct. App. 2005), the Indiana Court of Appeals noted that "[o]nce a contract for the sale of land is executed, even before a closing, equitable title vests with the prospective vendee," and that such a "holder of equitable title . . . is considered to have property rights sufficient to grant standing in other areas of Indiana law."  Given this, the Indiana Court of Appeals held that prospective owners of land that was being developed had "standing to petition for review of a decision by an area plan commission."  *Id.*   Anton Realty also cites *Ridenour v. France*, 442 N.E.2d 716, 717 (Ind. Ct. App. 1982), where the Indiana Court of Appeals held that a contract for the sale of land creates equitable title in the purchaser such that the purchaser bears the risk of loss.

- 21 -

These cases are entirely unrelated to whether equitable title can transform into legal title short of an executed and delivered deed. Whether Anton Realty, as holder of equitable title, has prudential standing (as *Hatfiled* may support) or beared the risk of loss (as *Ridenour* supports), is irrelevant to the question of whether equitable title could ever transform into legal title without meeting the clearly set forth requirements to transfer legal title. Accordingly, whether Anton Realty had equitable title to the Property is irrelevant to which party currently has legal title to it.

In the end, a valid transfer of legal title requires the grantor to "make, execute, and deliver a deed." *Patterson*, 822 N.E.2d at 210. Anton Realty never received a deed to the Property from M-3, but Guardian Brokers did. Therefore, Guardian Brokers has established legal title to the Property, and Anton Realty's invocation of various equitable doctrines in an attempt to undermine that showing all fail.

For these reasons, the Court grants summary judgment in favor of Guardian Brokers on its quiet title counterclaim as well as Anton Realty's quiet title claim. Because Guardian Brokers has established legal title to the Property, summary judgment in Guardian Brokers' favor is also appropriate on Anton Realty's declaratory judgment claim (which seeks a declaratory judgment that Anton Realty is the rightful owner of the Property) and slander of title claim (predicated on the fact that Anton Realty is the rightful owner of the Property). [*See* Filing No. 87.] Finally, summary judgment in favor of Guardian Brokers is also warranted on Anton Realty's claim pursuant to Indiana Code § 32-28-1-2. This statute requires the owner of a mortgage to release the mortgage after full payment within fifteen days of a written demand. *See* Ind. Code § 32-28-1-2. As made clear above, Anton Realty never obtained legal title from M-3, and thus it had no right under this statute to demand release of the mortgage.

**C.      Claims Regarding Events after Guardian Brokers' Acquisition of the Property**

        *1.      Anton Realty's Trespass Claim*

Guardian Brokers seeks summary judgment on Anton Realty's trespass claim, which is based on Guardian Brokers representatives' entrance onto the Property on November 26, 2013. "In Indiana, [t]respass is defined as [a]n unlawful interference with one's person, property, or rights . . . .  Any unauthorized intrusion or invasion of private premises or land of another." *TDM Farms, Inc. of N. Carolina v. Wilhoite Family Farm, LLC*, 969 N.E.2d 97, 109 (Ind. Ct. App. 2012) (quotation marks omitted).  To establish a claim for trespass, a plaintiff must establish that (1) "he possessed the land when the alleged trespass occurred" and (2) "that the trespassing defendant entered the land without a legal right to do so." *KB Home Ind. Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 308 (Ind. Ct. App. 2010).

Guardian Brokers maintains that Anton Realty cannot prove that it was without a legal right to enter the Property given that the lease explicitly permits the landlord to enter the Property if the tenant defaulted on the lease payments, which occurred here.  [Filing No. 107 at 32.]  Anton Realty responds that Guardian Brokers did not have valid title to the Property on November 26, 2013, and thus its entry onto the Property was unauthorized.  [Filing No. 134 at 32.]

For the reasons set forth above, Guardian Brokers had legal title to the Property on November 26, 2013.  Guardian Brokers is correct that, pursuant to the lease, it had the right to "re-enter upon the [Property]" and "remove all persons and property therefrom."  [Filing No. 57-1 at 15.]  And the undisputed evidence shows that Anton Realty defaulted on the lease by not making rent payments.  [Filing No. 57-1 at 4; Filing No. 57-1 at 56-57.]

Accordingly, Anton Realty cannot establish that Guardian Brokers entered the Property without a legal right to do so, and thus Guardian Brokers is entitled to summary judgment on Anton Realty's trespass claim.

> 2.      *Anton Realty's Interference with Prospective Business Advantage Claim*

Anton Realty claims that Guardian Brokers tortiously interfered with its prospective business advantage when its representatives entered the Property on November 26, 2013.  To prove such a claim, Anton Realty must demonstrate: "(1) the existence of a valid business relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference in the relationship; (4) the absence of any justification; and, (5) damages resulting from the defendant's interference." *Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 876 (Ind. Ct. App. 1998).  In addition, the plaintiff must prove that that the "defendant acted illegally in achieving his end." *Id.*

Guardian Brokers argues that it is entitled to summary judgment on this claim because, among other deficiencies, Anton Realty cannot prove that Guardian Brokers committed an illegal act because it had a right to be on the Property on November 26, 2013.  [Filing No. 107 at 32.] Anton Realty responds that the illegal-act requirement "is satisfied by Guardian[] [Brokers'] trespass onto the Property."  [Filing No. 134 at 33 n.19.]

As the Court already concluded above, Anton Realty cannot establish that Guardian Brokers trespassed onto the Property on November 26, 2013.  It therefore cannot establish the illegality element of its tortious interference claim.  Accordingly, Guardian Brokers is entitled to summary judgment on this claim.

### 3.    Guardian Brokers' Breach of Lease Counterclaim

Guardian Brokers, as successor in interest to M-3 and assignee of Fifth Third, asserts a counterclaim against the Truck Center for breach of the lease due to its failure to timely.  Guardian Brokers argues that the lease is governed by Indiana contract law, that it is undisputed that the Truck Center breached the terms of the lease when it failed to pay monthly rent as prescribed by the lease, and that it is therefore entitled to a judgment as to liability regarding this claim.  [Filing No. 107 at 33-35.]  The Truck Center does not dispute that it had not paid rent pursuant to the lease, but instead argues only that Anton Realty is the rightful owner of the Property so Guardian Brokers has no legal rights under the lease.  [Filing No. 140 at 9.]

"Because a lease is a contract, the essence of the landlord-tenant relationship is contractual in nature." *Ind. Dept. of Natural Resources v. Lick Fork Marina, Inc.*, 820 N.E.2d 152, 157 (Ind. Ct. App. 2005).  "When the terms of a contract are clear and unambiguous, those terms are con-clusive, and the court will not construe the contract or look at extrinsic evidence but rather will simply apply the contract provisions." *Id.*

The Court concluded above that Guardian Brokers has legal title to the Property.  The Truck Center does not otherwise dispute the facts underlying Guardian Brokers' breach of lease claim; it argues only that Anton Realty is the Property's rightful owner.  The undisputed evidence shows that Guardian Brokers, as the successor in interest to M-3 on the lease, [Filing No. 57-1 at 17],[8] could direct to whom the truck Center made payments and that the monthly payment is equal to the monthly mortgage payment.  [Filing No. 57-1 at 9.] Guardian Brokers sent Andy Mohr

---

[8] Guardian Brokers cites section 23(a) of the lease in support of its assertion that it is the successor to the lease, but it appears that section 23(d) is the more applicable provision.

Automotive Group[9] an invoice for the October 2013 rent payment for the Property on September 30, 2013.  [Filing No. 57-1 at 4; Filing No. 57-1 at 53-54.]  On November 1, 2013, Guardian Brokers sent Andy Mohr Automotive Group a Notice of Default, which stated that the October 2013 rent payment was late and that it had ten days to pay the balance due or it would be in default of the lease. [Filing No. 57-1 at 56-57.] Through at least August 13, 2014, Andy Mohr Automotive Group had not paid Guardian Brokers any rent.  [Filing No. 57-1 at 4.]

The undisputed evidence demonstrates that Andy Mohr Truck Center has breached the lease by not paying rents due under it.  Accordingly, Guardian Brokers is entitled to summary judgment as to liability on its breach of lease claim.  Damages will be ascertained via a later proceeding.

## IV.
### CONCLUSION

For the reasons explained, Guardian Brokers' Motion for Summary Judgment is **GRANTED**, [Filing No. 106], Anton Realty's Cross Motion for Summary Judgment is **DENIED**, [Filing No. 133], and Anton Realty's Motion for Oral Argument is **DENIED**, [Filing No. 141]. The determination of the damages award for Guardian Brokers' breach of lease claim remains unresolved.  Also, Anton Realty's claims against Defendant National Bank of Commerce, NA

---

[9] As noted above, Andy Mohr Automotive Group assigned the lease to Andy Mohr Truck Center. [Filing No. 57-1 at 23.]  In defending against this claim, Andy Mohr Truck Center does not argue that it is not responsible for payment of rent as the assignee of the lease, and the Court will thus not pursue this or any other arguments regarding this claim for them.  *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present . . . .  Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.") (citation and quotation marks omitted).

remain pending, though given the resolution of the ownership issue may be moot.  The Court requests that the Magistrate Judge attempt to resolve the remaining issues with the parties or, in the alternative, to establish a schedule to bring the case to conclusion.

The Court further notes that Anton Realty filed a motion to reopen discovery, requesting permission to depose a Rule 30(b)(6) representative of Guardian Brokers regarding an allegedly fraudulent mortgage Guardian Brokers and National Bank of Commerce, N.A. placed on the Property on December 4, 2013.  [Filing No. 145.]  In support of this request, Anton Realty asserted that Guardian Brokers "intended to use this mortgage as evidence to bolster its claim as to either ownership or value of the payments at issue in this lawsuit."  [Filing No. 146 at 1.]  The Magistrate Judge granted the motion in part and denied the motion in part, permitting Anton Realty to serve two interrogatories on Guardian Brokers and National Bank of Commerce, N.A.  [Filing No. 150 at 3.]  Given the Court's decision here that Guardian Brokers has submitted undisputed evidence establishing ownership of the Property dating back to September 2013, and the fact that the allegedly fraudulent mortgage was placed on the Property several months after ownership was established, the mortgage in question is not relevant to the issue of ownership as between Anton Realty and Guardian Brokers and thus no further discovery regarding ownership is necessary.  The Magistrate Judge's Order, however, still stands, as the issue of value of payments remains unresolved.

No partial final judgment shall enter at this time.


Date: 7/1/2015

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


Distribution via ECF only to all counsel of record